WELCH v. FARMERS' LOAN & TRUST CO. et al.

LASLEY v. SAME.

(Circuit Court of Appeals, Sixth Circuit. November 20, 1908.)

Nos. 1,786, 1,787.

1. VENDOR AND PURCHASER (§ 265*)—VENDOR'S LIEN—LOSS OF LIEN AS AGAINST SUBSEQUENT PURCHASER.

A vendor's lien, being a creature of equity, and not of positive law, must yield to a superior equity, and cannot be enforced against a purchaser or mortgagee without notice and for a valuable consideration from the vendee, who has been clothed by the vendor with apparent full title.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 700, 702; Dec. Dig. § 265.*]

2. VENDOR AND PURCHASER (§ 254*)—VENDOR'S LIEN—EQUITABLE LIEN—PAYMENT TO BE MADE IN PROPERTY.

Where, in carrying out a contract to convey a tract of land and assign certain judgments for a lump sum, the vendor was paid a part of such sum in cash and for the remainder accepted a covenant from the grantee to convey to him a stated number of town lots, to be laid out, no vendor's lien arose in his favor, especially where it did not appear how much of the expressed consideration was for the land, nor how the cash payment was applied.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 254.*]

3. VENDOR AND PURCHASER (§ 265*)—VENDOR'S LIEN—ESTOPPEL TO ASSERT LIEN AGAINST SUBSEQUENT MORTGAGEE.

An owner of land gave an option to purchase the same, which was assigned to a corporation. The corporation issued and sold bonds secured by a mortgage on such land and other lands, and the vendor, with knowledge of such fact, conveyed the land by a warranty deed and accepted part payment of the price from the proceeds of the bonds. Held, that no vendor's lien arose in his favor for the unpaid purchase money as against the mortgagee.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 700-712; Dec. Dig. § 265.*]

4. JUDGMENT (§ 685*)—PERSONS CONCLUDED—DECREE ESTABLISHING LIEN—MORTGAGEE NOT MADE PARTY.

A corporation executed a mortgage to a trustee to secure its bonds, which it sold. To a suit by a third person to establish a vendor's lien on a part of the land mortgaged the trustee was not made a party, and while the purchaser of the bonds was a party he had previously transferred the same. Held, that a decree therein establishing a lien was not conclusive as against the mortgage.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 685.*]

5. JUDGMENT (§ 593*)—SPLITTING CAUSES OF ACTION—FORECLOSURE AS TO PART OF PROPERTY.

A judgment creditor of a mortgagor levied on lands which were included with others in the mortgage. He then brought a suit in equity, making the mortgagee a party, in which the mortgage was foreclosed as to such lands only; the decree providing that it should be without prejudice to the right of the mortgagee to enforce its mortgage against the lands not involved in the suit. Held, that such decree was within the power of the court, and that the partial foreclosure did not estop the mortgagee from maintaining another suit to foreclose on the re-

maining lands as against persons claiming liens thereon who were not parties to the prior suit.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 593.*]

6. ACTION (§ 53*)—SPLITTING CAUSES OF ACTION—PERSONS ENTITLED TO OBJECT.

The rule against splitting causes of action is mainly for the protection of the defendant against excessive costs, and when he does not object other parties cannot.

[Ed. Note.—For other cases, see Action, Dec. Dig. § 53.*]

7. VENDOR AND PURCHASER (§ 254*)—VENDOR'S LIEN—EQUITABLE LIEN—BLENDING CONSIDERATION WITH OTHER DEMANDS.

Where a conveyance of land furnished only an indefinite part of the consideration for an indebtedness from the vendee to the vendor, the vendor has no lien upon the land for a balance remaining due on such indebtedness.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 254.*]

8. CORPORATIONS (§ 668*)—PROCESS—SERVICE BY PUBLICATION—AFFIDAVIT.

Under Rev. St. Ohio 1908, § 5046, which provides that "before service by publication can be made an affidavit must be filed that service of summons cannot be made within this state upon the defendant to be served by publication," an affidavit is insufficient to authorize service by publication upon a foreign corporation where it states only that service cannot be made within the state upon an individual defendant "and" such corporation, and states no facts showing that the corporation is not doing business in the state and subject to service therein.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 668.*

Service on foreign corporations, see notes to Eldred v. American Palace Car Co., 45 C. C. A. 3; Cella Commission Co. v. Bohlinger, 78 C. C. A. 473.]

Appeals from the Circuit Court of the United States for the Southern District of Ohio.

J. M. McGillvray and C. B. Matthews, for appellants.
W. O. Henderson, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The controversies in the two appeals above entitled originated in the same case, that of a suit in equity brought by the Farmers' Loan & Trust Company against the Consolidated Wellston Coal & Iron Company and other defendants, among whom were the appellants, Welch and Lasley, to foreclose a mortgage given to the said loan and trust company by the said coal and iron company to secure an issue of bonds of the latter company. Welch and Lasley were made defendants in that suit because they claimed an interest in the mortgaged property superior to the mortgage. Those defendants filed separate answers, each claiming a vendor's lien upon a considerable part of the lands covered by the mortgage, to which liens they claimed the mortgage was subordinate, and they prayed that their liens might be established as paramount to the mortgage and for relief accordingly. The court below rejected both of these claims, holding, for reasons stated in its opinion, that they had no foundation in equity. The circumstances on which each of the claims

are founded are so far similar that they were heard on one record and as one case, but with regard, also, to the slightly differing facts. We shall therefore dispose of both appeals by one opinion. Extended narrations of facts regarded as pertinent to these appeals by the counsel for the parties, for the purpose, we presume, of meeting the different views which it was thought the court might entertain of the legal questions involved, are made in their briefs; but we shall sift out only such as we deem necessary to the proper disposition of the cases.

One Wells undertook the project of founding extensive manufacturing and mining industries at Wellston, Ohio, and, as one of the means, organized a corporation, the Consolidated Wellston Coal & Iron Company, with capital stock amounting to $4,000,000; and, acting in its behalf, he proceeded to acquire large tracts of land in the vicinity, deemed necessary for its purposes. Among these was one of 465 acres which had once belonged to the appellant Lasley. The latter had sold and conveyed it to Welch, the other appellant, Yeoman, Milburn, and other grantees. The grantees, on account of fraud alleged to have been practiced on them by their vendor, filed a bill in the state court praying for rescission, and they obtained a decree rescinding the sale, and awarding them several judgments for money against Lasley for which the land was directed to be sold. The sale was made, but did not realize the amount of the judgments. Ultimately the title to the land under the sale became lodged in Welch. In this state of affairs Wells obtained from Welch an option for the purchase of the 465 acres and some of the judgments against Lasley, and thereupon assigned his option to the Consolidated Wellston Coal & Iron Company. Welch, anticipating the purchase under the option, executed his deed, bearing date October 14, 1887, and transmitted it to the First National Bank of Wellston, with the following letter of instructions:

"October 14, 1887.

"First National Bank, Wellston, Ohio—Dear Sir: I herein hand you my deed to the Consolidated Wellston Coal & Iron Company to 465 acres of land adjoining Wellston; also assignment of John and J. M. Welch of judgment against H. G. Lasley; also agreement to procure assignment of judgment against Lasley in favor of Yeoman & Milburn—all of which papers I send you at request of Mr. H. Wells, of your city, for greater convenience of payment by him of the consideration named in the deed inclosed, viz., $41,216. Upon payment of this sum you will please deliver to his order the deed and other papers inclosed, and not otherwise. I retain full control over the deed and papers, and you will please consider that you receive them, not in escrow for both grantor and grantee, but subject to my order, unless he pay in the money before they are recalled by me. Please acknowledge the receipt of these papers, and advise me should the money be paid in.

"Very truly yours,                    J. M. Welch."

The bank acknowledged the receipt of the letter and contents, reciting the instructions contained in the letter. Meantime Wells was negotiating for the borrowing of money by the coal and iron company on its bonds, secured by a mortgage on its property, for the purpose of paying, among other things, for the land they were buying of Welch. He had so far succeeded that on or about the 10th day of October, 1887, an agreement for a loan was effected with one Hinckley of Chicago, and the bonds of the company secured by a mortgage of that

date to the Farmers' Loan & Trust Company, the mortgage above mentioned now being foreclosed in the principal suit, were prepared; but on what day they were delivered does not certainly appear. The mortgage was recorded November 5, 1887. This mortgage by its terms covered certain tracts of land definitely described, among which was the 465-acre tract, and all the company's other property then owned or thereafter to be acquired. Out of the proceeds of the bonds and mortgage, Wells, who conducted the business for his company, appropriated $30,000 to pay Welch for the 465 acres. Welch was present at the time when Hinckley's money was received at the Wellston bank, and, although there is some conflict in the testimony, the court below was convinced, and we are convinced, that Welch was aware that the tract he had agreed to sell was included in the mortgage and that the money he was to receive was part of that thus procured by Wells. It appears that the amount which was to be paid Welch was the sum which it had cost him, and this at the date last mentioned had not been figured out; but Wells had supposed the $30,000 would cover it. Later on he ascertained from Welch that it amounted to $41,216, which was the consideration named in Welch's deed to the company above mentioned. Thereupon Wells made another arrangement with Welch for the satisfaction of the purchase price, and by this his company was to pay $30,000 in money and in lieu of the excess of $11,216 was to become obligated to convey to Welch 50 lots in Wellston. Then on November 12, 1887, Welch indorsed on his letter of October 14, 1887, to the bank, the following:

"November 12, 1887, Wellston, Ohio.

"First National Bank, Wellston, Ohio—Dear Sirs: You are hereby authorized to deliver to the Consolidated Wellston Coal & Iron Company, of Wellston, Ohio, the deed and assignments within mentioned as soon as the draft for $30,000, this day given me by you, on New York City, has been paid. As I have agreed, with the consent of the within-named H. Wells, to accept the said $30,000 cash and the obligation of said company to convey to me 50 lots in Wellston in full payment of the consideration price of said 465 acres and said judgments.                   Very truly,                        J. M. Welch."

The obligation entered into by the company was as follows:

"Wellston, Ohio, November 12, 1887.

"Whereas, Johnson M. Welch, of Athens, Ohio, proposes and has agreed to sell to the Consolidated Wellston Coal & Iron Company, of Jackson county, Ohio, 465 acres of land, part of the farm, near Wellston, Ohio, known as the 'Lasley farm,' said 465 acres being the same deeded to said Welch by the sheriff of said Jackson county; and whereas, said Welch is willing to accept at the price of $200 each and as a part of the purchase price of his said land, fifty (50) of the inlots, to be surveyed and laid off by said company as an addition to the said town of Wellston, out of the lands now being purchased by said company: Now, therefore, it is agreed hereby between the said company and said Welch that said Welch may subscribe for said fifty (50) lots, and that the said subscription may be marked 'Paid'; that said company hereby acknowledges payment in full, at said rate of two hundred dollars ($200) for each lot, of said fifty (50) lots, by a credit of the sum of ten thousand dollars ($10,000) on the purchase money of said 465 acres; that at the first 'drawing' or division of the lots of said company, to be hereafter made, said Welch shall participate therein on the same terms and have equal rights with the other subscribers to said lots; and as soon as it shall be ascertained by said 'drawing' or division what particular fifty (50) lots have been thus

'drawn' by or aparted to said Welch, the said company are to convey to him by good and sufficient deed, with covenant of general warranty, and give him possession thereof.          The Consolidated Wellston Coal & Iron Company,

"By Harvey Wells, President,

"H. S. Williard, Treasurer,

"Johnson M. Welch."

On or about that date the deed of Welch was delivered to the company. Welch has made efforts to secure the conveyance of the 50 lots from the company, but they have been unavailing. Reserving now another question which concerns the effect of a decree of the state court upon the matter we are now considering, and to be presently examined on its own facts, enough has been stated to develop the first question, which is whether Welch is entitled to assert an implied lien upon the land in question for that part of the consideration agreed to be paid to him which was in excess of the $30,000 which he actually received.

The general rule is well settled that ordinarily the vendor of real estate or of an interest therein is entitled to a lien upon the estate sold for so much of the purchase price as remains unpaid at the time of the conveyance; and it is admitted that this general rule is recognized as prevailing in Ohio, nor is it doubted that it is a principle of equity recognized by the courts of the United States in all jurisdictions wherein it is not otherwise ordained by the local law. But the rule has its limitations. Being a creature of equity, and not of positive law, it must yield to a superior equity. So it cannot prevail against a purchaser from the vendee, for value, without notice of the existence of such a lien; for it must be admitted that one who has not taken the precaution to protect his right by some visible muniment of it, and allowed another to wear the appearance of ownership and of the power of disposition, stands upon far lower ground in the estimate of equity than one who, in good faith and relying upon the appearances which the original vendor has permitted his vendee to assume, has become a purchaser and has paid the consideration of his purchase. Hence the exception to the rule is that, while the lien may be asserted against the vendee and all others standing only on his right, it cannot prevail against those who have also acquired an equity which puts them on higher ground than that of the first vendee. A subsequent purchaser, although for value, yet having notice of the facts which would entitle the first vendor to a lien, an heir, an assignee in bankruptcy, or any other who has parted with nothing, is not clothed with an equity, but has only the right of the vendee, and cannot deny the lien.

So far we have had regard to the circumstances in which a lien once arising may survive or become ineffective. This was due to the full statement of the nature of such a lien. It remains to consider, although it is confessedly not the logical order, the circumstances which will prevent the implication of an intent to reserve a lien; for it is upon such an implication that the doctrine rests. Lord Elden, in his opinion in the well-known case of Mackreath v. Symmons, 15 Ves. 329, said that in every case the intention must be inferred from its special circumstances; and yet in the extended course of practice sev-

eral particular circumstances have been recognized as quite decisive criterions. One of these quite apposite to the case before us is thus stated in Snell's Principles of Equity (2d Ed.) 109, as the "true rule":

"Although the mere giving of a bond, bill, promissory note, or covenant for the purchase money, or the granting of an annuity secured by bond or covenant, will not be sufficient to discharge the equitable lien, yet where it appears that the note, bond, covenant, or annuity was substituted for the consideration money, and was in fact the thing bargained for, the lien will be lost."

For a technical statement, it would seem to have been more accurate to say that in such circumstances no lien would be implied. But in substance it no doubt states the settled rule of law in England and is the prevailing law in the United States. Bispham's Principles of Equity, § 355; Bayley v. Greenleaf, 7 Wheat. 46, 5 L. Ed. 393; De Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587; Fisher v. Shropshire, 147 U. S. 133, 13 Sup. Ct. 201, 37 L. Ed. 109; Slide & Spur Gold Mines v. Seymour, 153 U. S. 509, 14 Sup. Ct. 842, 38 L. Ed. 802; and Whiteley v. Central Trust Company, 76 Fed. 74, 22 C. C. A. 67, 34 L. R. A. 303, where this subject was fully considered in the opinion of Judge Lurton, for this court. Many of the most authoritative decisions were there cited and canvassed. In that case the consideration for the conveyance was the covenants of the grantee to do certain things and were not for the payment of money. The only difference between that case and this is in the fact that there the covenants were the whole consideration, while in this the covenant extends to that part of it only which was not otherwise paid. But that circumstance is immaterial. The principle and the rule are the same in both cases. And the law in Ohio is the same as that above stated, not only as regards the general rule, but also in respect to the qualification of it just noted. Williams v. Roberts, 5 Ohio, 35; Mayham v. Coombs, 14 Ohio, 428; Dietrich v. Folk, 40 Ohio St. 635; Mutual Aid, etc., Company v. Gaske, 56 Ohio St. 298, 46 N. E. 985.

If in the present case the contract indicated by Welch's first letter to the bank had been the real contract and had been carried out, doubtless, in the absence of any other controlling equity, the lien for the unpaid purchase money, if any had been withheld, would have attached. But it was altered, and in lieu of the excess beyond $30,000 the covenant of the company to convey the 50 lots was substituted in its stead. Having taken that covenant for part of the consideration, Welch could no longer resort to the contract of sale as the foundation of his right. His remedy was on the covenant of the company for the conveyance of the lots, either for its performance or for damages for its breach. The failure of the latter to convey them did not restore him to his original position. If the lien did not attach at the time of his conveyance, it would not spring into existence upon the failure of the company to perform its contract.

But, further, it appears that certain judgments against Lasley were included in the sale, and that for no separate value or price. It may be that it would have been competent if the original bargain had gone through, and the bargain was that the purchaser should pay what the property had cost Welch, some data could have been supplied to show

how much of the purchase price the judgments represented. But the basis of the cost to Welch was not the basis on which the contract was concluded. Moreover, it is impossible to say how the $30,000 which was paid was applied, whether in payment for the land or the judgments, or in what parts. It was paid for the purchase of all, "in a lump." In such a case of the sale of land and of personal property, with no definite price for either, the equitable lien for the purchase price does not attach to the land, for there are no means supplied for distinguishing how much of the price should be fastened upon the land and how much was due to the personal property for which the law gives no lien; and equity will not attempt to surmount such difficulties for a vendor who has been so careless as not to preserve some means upon which the court can act. 2 Jones on Liens, § 1072, and the title of "Mixed Considerations," 29 Am. & Eng. Ency. of Law (2d Ed.) 745.

For these reasons, we think that in the circumstances mentioned no lien accrued to Welch for that part of the purchase price for his conveyance which was represented by the company's covenant to convey the 50 lots to him. Other reasons leading to the same result are urged by counsel, of which we shall take notice of some only, one of which is the one on which the court below relied in rejecting the claim, namely, that Welch was, during the progress of the transaction which culminated in his conveyance, aware of the fact that the coal and iron company was securing the title to these 465 acres for the purpose of mortgaging them to raise money for its objects, among which was the purchase from him of this tract of land. To do this he must have understood that the proposed mortgagee would require a clear title, or at least would be likely to depend upon the apparent muniments of title to the property to be mortgaged, and would have no means of guarding against secret liens. Equity required, especially since one object of the transaction of borrowing was to accomplish the transaction with himself, that he should have then disclosed his claim. Instead of this, he remained silent and took $30,000 of the borrowed money. By giving a deed which on its face purported to convey a clear title and recited the payment of the purchase money, knowing that this was what the mortgagee expected, he only fulfilled the known expectations of his grantee and of the mortgagee. It is true, as urged by his counsel, that the mortgage was executed some days before Welch made his conveyance. But for some time before Wells had held an option to purchase the land. The purchase would involve the making of a clear title to the land by Welch. Wells assigned his option to the company, which, of course, carried the right to demand a clear title. And this was what Welch's deed professed to give. But it would not give it if Welch were permitted to set up the secretly reserved lien he now claims. The option to purchase was the foundation of the conveyance, notwithstanding the variation in its terms in regard to the purchase price, and the conveyance, being with full covenants of warranty, would have relation to the time when the option was given. And it is just that this should be so, for otherwise the vendor might, before giving his deed, impair the value of the property and disappoint the vendee. In its

salient facts the truth. is that from the giving of the option by Welch to the delivery of his deed the several steps were parts of one transaction. We quite concur in the opinion of the court below in thinking that the decree might well be rested upon the ground that Welch is precluded by his own acts, accompanied by his knowledge of what was going forward, from setting up his claim for a vendor's lien.

All that has thus far been said concerns the merits of the original transaction. But another matter has supervened which gives us pause and requires consideration of its effect upon the rights of the parties as they stood upon their original footing. On July 27, 1889, a year and nine months after making his conveyance, Welch, having failed to obtain the 50 lots which the company had promised him, filed a petition in the court of common pleas of Jackson county against the Consolidated Wellston Coal & Iron Company and Hinckley, setting forth the conveyance by him and the agreement of the company to convey the 50 lots as part of the consideration, and its failure, though often requested, to comply therewith, and praying that a lien on the lands conveyed might be established in his favor and that the lands might be sold to satisfy it. The defendants answered the bill, denying, upon the grounds stated, that Welch ever had, or was then entitled to, any lien upon the premises. Evidence was taken, and upon the hearing that court decreed that Welch was entitled to a first and paramount lien upon the lands in question, and ordered them to be sold to satisfy it. This judgment was affirmed upon appeal by the Circuit Court, and upon further appeal by the Supreme Court of Ohio. The appellant Welch relies upon this judgment as an estoppel which prevents this complainant, the Farmers' Loan & Trust Company, from denying that he has the lien he claims. But the loan and trust company was not made a party to that suit, and, although Hinckley was, all of the bonds had before that time been hypothecated by him to banks and a private party for loans made to him in good faith and without knowledge of any lien upon the lands mortgaged to secure the bonds superior to said mortgage. The bonds were in the possession of the pledgees, and the debts they secured remained unpaid. The company had in the meantime conveyed the land to Hinckley and had become wholly insolvent. The only party, therefore, who was seriously affected by the decree of the state court of common pleas was Hinckley in his position of the owner of the equity of redemption in respect of the land. There is no published report of the decision of the Supreme Court, and we are not aware whether any opinion was filed. If there had been, we should have felt bound to consider it, with its other decisions upon the same subject, in determining what the law of Ohio is. But, while the evidence in that case has been stipulated into this, other testimony has been taken which has a material bearing upon essential questions, and it is by no means certain that the state court would have reached the same conclusion if all that now appears had been put before it. At all events, we are satisfied that under the settled law of Ohio the lien here claimed could not be sustained. See the Ohio cases above cited.

Another distinct and somewhat peculiar defense is presented by counsel, which is this: This mortgage, as has been observed, covered not

only the 465 acres, but several other tracts, which for the sake of brevity in description we will call "the other lands." One Jones obtained a judgment against the Consolidated Wellston Coal & Iron Company in a state court of Ohio, and levied an execution on the "other lands," and filed a petition in aid thereof, bringing in, with other defendants, the Farmers' Loan & Trust Company as a lien claimant. The latter company answered, setting forth its claim by mortgage, and praying that it be declared a first lien, and that it be foreclosed as respected the "other lands." The court directed the lands to be sold, which was done; and the court, having found the mortgage to be a first lien, directed the proceeds of the sale to be paid to the holders of bonds past due. But the court in its decree "further ordered, adjudged, and decreed that this decree and all proceedings thereunder are, and shall be, without prejudice to any right or suit of said Farmers' Loan & Trust Company to sell any of the property embraced in said mortgage to it and not included in the foregoing order to sell, or to foreclose said mortgage in respect to any lands or tenements not described in the petition of the plaintiff." Counsel urge that by this partial foreclosure, splitting the cause of action as it is called, the mortgage was entirely merged in the judgment and ceased to longer incumber the 465 acres which is the subject of the present suit. This, of course, assumes that the court which rendered the decree was without the power to order that the proceedings in that suit should be without prejudice to the right of the Farmers' Loan & Trust Company to have recourse to the 465 acres for the further satisfaction of its debt. But neither Welch, nor Lasley, the other appellant, were parties to that suit, nor could they properly have been made parties, for they had no interest in the land over which the jurisdiction of the court was being exercised. Not being parties, they were in no wise prejudiced by the decree. Not being affected by it, they were not thereby estopped from asserting any previous right they possessed. As they were not themselves bound by it, so neither was the Farmers' Loan & Trust Company affected in any relation which it held toward them, for estoppels must be mutual.

But, aside from this consideration, we think that the court had power to direct the sale of the lands brought under its control by the petition of Jones, at the same time saving the security of the other mortgaged property unaffected by its proceedings. Jones was entitled to enforce the lien of his judgment upon the "other lands," and the court could not do otherwise than to enforce the lien by selling the land. It might, perhaps, have ordered them sold subject to all prior liens; but it might, also, if it saw fit, having the proper parties before it, sell the land free of the liens, marshal the liens, and apply the proceeds of the sale to the liens in their proper order. The situation was somewhat complex, and it was the peculiar province of a court of equity to so shape its course as to do justice to all the parties concerned. It seems to us that the scheme was a judicious one, but of this we need not judge. It is enough that the court had the power to mold its remedies as it did. As observed by Earl, J.:

"This principle (that is, the result of splitting a cause of action) is rigidly enforced in common-law actions; but there must be many cases in equity

where the courts, having ample power to so mold the relief granted as to prevent injustice, will not enforce it unless equity in the particular case requires it." O'Dougherty v. Remington Paper Company, 81 N. Y. 496, 500.

To the extent of the proceeds of the sale of the "other lands," the burden of the mortgage on the 465 acres was relieved. Besides, the rule relating to the splitting of causes of action exists mainly for the protection of the defendant; that he be not twice taxed for the same cause of action. But the coal and iron company acquiesced in the judgment and took the benefit of it in the reduction of its debt. "The creditor has not the right to assign the debt in parcels, and then, by splitting the causes of action, subject his debtor to the costs of more suits than the parties originally contemplated; but, when the debtor himself does not object, no other party can object for him." Marziou v. Pioche, 8 Cal. 522, 536; Claflin v. Mather, 98 Fed. 699, 39 C. C. A. 241; Mills v. Garrison, 3 Keyes (N. Y.) 40. So much as we have here said is applicable to the appeals of both the appellants, Welch and Lasley, except so far as relates to Welch's suit for a lien in the state court.

Proceeding, now, to the further consideration of the Lasley appeal, we observe, as before stated, that Lasley had at one time owned the 465 acres; that he had sold it to Welch and others; that the sale had been rescinded on their complaint; that several judgments for the purchase money had been awarded in favor of the purchasers and against Lasley; that the lands had been sold under the decree for the satisfaction of the judgments; that the sale had been confirmed, and a deed or deeds had been given to the purchaser or purchasers, and the title thereunder had come to Welch. While Wells was engaged in securing these lands from Welch for the Consolidated Wellston Coal & Iron Company, Lasley set up a claim to them. What was the foundation or the nature of his claim does not appear, and no one connected with his suit seems to know. From all that does appear, the plain inference is that there was nothing of substance in it. Nevertheless, he asserted a claim, and Wells was constrained to agree to pay him $10,000 for it and the release of a personal judgment against himself, all of which has been paid, except $2,000, for which Lasley now claims a lien upon the land. If Lasley's claim was colorable, and made bona fide, it would doubtless furnish a legal part consideration for the agreement to pay him the $10,000. If there was nothing in it, and it was set up solely for the purpose of obstructing Wells in his negotiations for the land and the borrowing of money until his exaction should be satisfied, a question might arise in respect to the equity of his claim and the nature of the interest to which it could attach. His deed was a quitclaim deed and operated only to convey such interest as he had. If it conveyed no interest, to what did his supposed lien attach? The general rule would be that the vendor's lien would attach to the interest conveyed, and not to a whole property of which it is a part. If a tenant in common should sell his interest, and there remained unpaid part of the purchase money, his lien would attach to the interest he sold; certainly not to the shares of the other tenants. But how shall the interest which a quitclaim deed conveys be measured? Sometimes, indeed, a quitclaim contains

a grant and operates as a conveyance, or it may be a mere release of an indefinite claim. It may be a substantial interest, or it may be the "shadow of a shade." Quite often it approximates the latter. And it may be that the uncertainty of the measurement ought to preclude the application of the doctrine to a case where it is not employed to convey a title to property, but only to remove a cloud, or some uncertain and problematical interest. This topic is suggested and argued by counsel for the appellee somewhat. However, we do not find it necessary to make a decision upon it.

But the $10,000 agreed to be paid to Lasley had other considerations besides his quitclaim deed. Among them was a judgment which he had against Wells, which as part of the agreement was to be extinguished. But how much was to be allowed for that does not appear, nor, as it seems, was there any apportionment of the $10,000 as the consideration for either of the matters and things surrendered by Lasley. For this reason, as we said of a similar feature of Welch's claim, the lien, because of the uncertainty in settling its extent, could not be maintained. Besides, as in Welch's case, the mortgagee of the Consolidated Wellston Coal & Iron Company had no notice of Lasley's claim of lien upon the mortgaged property. All that it might have known through Wells, who was acting for it, was that Lasley had asserted a claim of some sort, but that Wells had bought it up in a transaction in which his own affairs were commingled. But whether or not the coal and iron company might be affected, neither the Farmers' Loan & Trust Company or its beneficiary had notice of Lasley's claim at the time of the receiving of the bonds and mortgage and parting with the money which was the proceeds of the loan. There is a contention that they had such notice; but it is refuted by the strong improbability that they would accept an incumbered title, and the weight of the positive evidence is opposed to that conclusion. Lasley's quitclaim deed was executed October 17, 1887. Thus it will be seen that this transaction was running along pari passu with that with Welch. We have no doubt that Lasley knew, as well as Welch, that Wells was trying to get a title which he could offer as free from incumbrance, and it would be inequitable that he should make a deed which would promote such a purpose and after it had been accomplished bring forward a secret lien to impair the fruits of it. In Kettlewell v. Watson, L. R. 26 Ch. Div. 501, it was held by the Court of Appeals that, notwithstanding the vendors retained the possession of their deed, yet their agent had permitted it to be registered in a county where, as in this country, a registration law prevailed, and this was apparently done to facilitate sales of the land by the vendee, the vendor's lien for unpaid purchase money was gone, so far as subsequent innocent purchasers of the vendee were concerned. The same rule of law had been conceded by Fry, J., in the court below; but he had held in favor of the lien, because he held that the agent, in permitting the registration, had acted without authority.

Lasley claims, however, that his lien has already been established by an adjudication of the court of common pleas, and affirmed by the Supreme Court of Ohio, in a suit brought by him in October, 1889, against the said coal and iron company, the Farmers' Loan & Trust

Company, and Hinckley to establish this same lien. It suffices to say of that suit that it would seem to have the effect claimed for it if the court acquired jurisdiction of the Farmers' Loan & Trust Company. It is claimed by the latter company that the proceedings taken to bring it before the court were not sufficient in law. No personal service of process was had, the company being a New York corporation. Provision is made by statute in Ohio for substituted service on non-residents of the state by publication of notice. Section 5046 of the Revised Statutes of Ohio of 1908 provides as follows:

"Before service of publication can be made, an affidavit must be filed that service of summons cannot be made within this state upon the defendant to be served by publication, and that the case is one of those mentioned in the preceding section; and when such affidavit is filed, the parties may proceed to make service by publication."

The affidavit made in that case was this:

"State of Ohio, Jackson County—ss.:

"Hiram G. Lasley, being first duly sworn, says that service of summons cannot be made in this state upon defendant Francis E. Hinckley and the Farmers' Loan & Trust Company; that said Hinckley resides in Chicago, Illinois, and said Farmers' Loan & Trust Company is a corporation organized under the laws of New York; and that this action or case is one of those mentioned in section 5048 of the Revised Statutes of this state.          Hiram G. Lasley.

"Sworn to and subscribed before me this October 21, 1889.

"T. J. Williams, Clerk,
"E. P. Williams, Deputy."

The court below stated its reasons for holding the affidavit void as follows:

"The affidavit shows that service of a summons could not have been made in this state on both Francis E. Hinckley and the Farmers' Loan & Trust Company, but does not show that service could not have been made on the Farmers' Loan & Trust Company alone. The context shows that the company is a corporation organized under the laws of New York, but for aught that appears it may have been doing business in this state and may have had an office and a managing agent here, upon whom service could have been made. There is no context, showing that 'and' was used by a mistake, which would justify the court in correcting the mistake by substituting for it the word 'or.' The attempted service, therefore, based upon this affidavit, is insufficient, and did not bring the Farmers' Loan & Trust Company before the court."

And the court cites Galpin v. Page, 18 Wall. 366, 21 L. Ed. 959, Morse v. Presby, 5 Foster (N. H.) 302, and Williamson v. Berry, 8 How. 495, 12 L. Ed. 1170. To the writer of this opinion the criticism of the learned judge seems too astute, and that the natural meaning of the affidavit, taken in connection with its obvious purpose, is that neither of the defendants named could be served in this state. But the rule upon this subject is for a strict construction, and I am not disposed to differ from the other members of the court, who are inclined to concur with the court below.

The result is that the decree, in respect to both the cases above entitled, will be affirmed, with costs.

NOTE.—The following is the opinion of Thompson, District Judge, in the court below:

THOMPSON, District Judge. November 2, 1893, the bill in this cause was filed to foreclose a mortgage covering 21 parcels of land, marshal liens, sell the

land, etc. July 14, 1892, more than three months before the filing of the bill herein, a suit was brought by Ebenezer Jones, trustee, in the court of common pleas of Jackson county, Ohio, against the Consolidated Wellston Coal & Iron Company, Francis E. Hinckley, the Farmers' Loan & Trust Company, the complainant herein, and others, to enforce a judgment lien against 20 of said parcels of land, marshal liens, sell the land, etc. January 30, 1893, the Farmers' Loan & Trust Company filed an answer in said suit, contesting the claim of Jones, trustee, to a lien on said 20 parcels of land, setting up its own lien thereon, stating that it did not then desire that its mortgage should be foreclosed, but praying that the lien thereof be declared to be the first and best lien on said lands. February 15, 1898, the Farmers' Loan & Trust Company filed an amendment to said answer praying that its mortgage might be foreclosed, the priority of the liens determined, the lands sold, and the proceeds applied to the payment of its mortgage. Afterwards, a decree was rendered, in said suit, foreclosing said mortgage, determining the order of priority among the several lienholders, and ordering the sale of 20 parcels of land and the distribution of the proceeds thereof, but providing that said "decree and all proceedings thereunder are and shall be without prejudice to any right or suit of said Farmers' Loan & Trust Company to sell any of the property embraced in said mortgage to it, and not included in the foregoing order to sell, or to foreclose said mortgage in respect to any lands or tenements not described in the petition of said plaintiff." Afterwards the 20 parcels of land were sold, and the balance of the proceeds remaining, after paying costs, taxes, etc., were applied in part payment of the bonds secured by said mortgage. Afterwards the complainant dismissed the bill herein as to the 20 parcels of land sold by the decree of the state court and as to all of the defendants save the Consolidated Wellston Coal & Iron Company, Francis E. Hinckley, Ebenezer Jones, individually and as trustee, Johnson M. Welch, Hiram G. Lasley, and John S. McGee, and filed an amendment to the bill setting up the proceedings in the state court, the sale of the 20 parcels of land, the distribution of the proceeds thereof, and prayed that the mortgage be foreclosed as to the twenty-first parcel of said lands, containing 465 acres, and that all liens thereon be marshaled, and that said parcel be sold and the proceeds distributed, etc.

The defendant Welch answered, setting up the following defenses, namely: (1) That the right to maintain a suit on the bonds and mortgage was merged in the decree of the state court. (2) That he has a vendor's lien on said 465-acre tract of land prior and paramount to the mortgage lien of the complainant. The defendant Lasley also answered setting up the following defenses, namely: (1) That the right to maintain a suit on the bonds and mortgage was merged in the decree of the state court. (2) That he has a vendor's lien on said 465-acre parcel of land established by the court of common pleas of Jackson county, Ohio, in a cause in which the complainant herein was a party defendant and before the court, and which decree was afterwards affirmed on appeal by the circuit and Supreme Courts of Ohio.

To these answers formal replications were filed, and the case was submitted upon a stipulation of facts agreed to by the parties, and the testimony of certain witnesses in the form of depositions, and the testimony of other witnesses transcribed from stenographic notes taken in the course of various litigations in the common pleas and circuit court of Jackson county, Ohio.

First. Was the right to foreclose the mortgage upon the 465-acre parcel of land merged in the decree of the state court foreclosing the mortgage against the other 20 parcels of land? The rule of law which forbids the party complaining from subjecting a defendant to two or more suits, instead of one, by splitting a single cause of action, is not applicable to this case. The purpose of the rule is to protect defendants against the vexation, delay, and expense of litigation by piecemeal. The suit in the state court was not brought by the Farmers' Loan & Trust Company, nor was it brought to foreclose the mortgage in question, nor to foreclose any lien upon the 465-acre parcel. The Farmers' Loan & Trust Company was a defendant in that suit, and by cross-petition set up its mortgage lien upon the 20 parcels which Jones, trustee, the plaintiff in that suit, sought to subject to the payment of his claim. The Consolidated Wellston Coal & Iron Company, the mortgagor, and Francis E.

Hinckley, the purchaser of the bonds and of the lands, who have been sued twice, are the only defendants who have any reason to complain of the splitting of the cause of action; but they have not complained, and, on the contrary, acquiesced in a provision in the decree permitting the Farmers' Loan & Trust Company to foreclose the mortgage in respect to any lands and tenements not described in the petition of Jones. trustee, and would now be estopped thereby from complaining. Welch and Lasley have not been sued twice. They were not parties to that suit, and were not necessary parties thereto, and their rights were in no wise prejudiced by the decree therein. The right of the Farmers' Loan & Trust Company to enforce its mortgage lien against the 465-acre parcel was not merged in the decree of the state court.

Second. Had Welch a vendor's lien on said 465-acre parcel prior and paramount to the mortgage lien of the complainant herein?

A vendor's lien on the 465-acre parcel was established against the Consolidated Wellston Coal & Iron Company and Francis E. Hinckley by the decree of the court of common pleas of Jackson county, Ohio, which was afterwards affirmed by the circuit court of Jackson county, Ohio, and by the Supreme Court of Ohio, and as against them is final and conclusive; but the Farmers' Loan & Trust Company was not a party to the suit in which the decree was rendered,' and the question presented is whether a vendor's lien can be asserted against it, the Farmers' Loan & Trust Company, the mortgagee of the vendee? Harvey Wells was the promoter of a scheme to make Wellston a seat of manufacturers, the "Birmingham of Ohio," as stated in his circular letter to Welch, January 14, 1888. (See Exhibit P.) In furtherance of this scheme he organized the Consolidated Wellston Coal & Iron Company. Neither he nor the company had the money or the lands necessary for the successful prosecution of the scheme. In order to raise money to buy lands, the company issued bonds and secured them by mortgage on lands acquired and to be acquired. The lands in question, although not then acquired, were described in the mortgage by metes and bounds. The mortgage was signed, acknowledged and delivered on the 10th day of October, 1887, and was received for record and recorded on the 5th 'day of November, 1887. Some time in the summer of 1887 Welch gave Wells an "option" on the lands in question, the 465-acre parcel described in the mortgage, which Wells afterwards assigned to the company. The price fixed was to be substantially what the property cost Welch. This was afterwards declared by Welch (much to the surprise of Wells) to be $41,216. On the 14th day of October, 1887, Welch executed a deed conveying said lands to the company, the consideration price expressed in the deed being $41,216, and on the same day deposited the deed with the First National Bank at Wellston, with a letter of instructions which reads as follows: "October 14, 1887.

"First National Bank, Wellston, Ohio—Dear Sirs: I herein hand you my deed to the Consolidated Wellston Coal & Iron Company to 465 acres of land adjoining Wellston; also assignment of John & J. M. Welch of judgment vs. H. G. Lasley; also agreement to procure an assignment of judgment against Lasley in favor of Yeoman & Milburn—all of which papers I send you at the request of Mr. H. Wells, of your city, for greater convenience of payment by him of the consideration named in the deed inclosed, viz., $41,216. Upon payment of this sum you will please deliver to his order the deed and other papers inclosed, and not otherwise. I retain full control over the deed and papers, and you will please consider that you receive them, not in escrow for both grantor and grantee, but subject to my order, unless he pay in the money before they are recalled by me. Please acknowledge receipt of these papers, and advise me should the money be paid in.
"Very truly yours,                                    J. M. Welch."

The receipt of the deed and assignments was acknowledged by the bank in a letter of which the following is a copy, viz.:

"Wellston, Ohio, October 15, 1887.

"Received of J. M. Welch one deed and two assignment papers, to be held in trust and to the order of J. M. Welch, but to be handed over to Harvey Wells

if said Wells shall pay into this bank to the order of said Welch the sum of forty-one thousand two hundred and sixteen ($41,216.00) dollars before said Welch shall order otherwise.     Respectfully,     J. H. Sellers, Jr., Cashier."
"To J. M. Welch, Athens, Ohio."

Afterwards, under date of November 12, 1887, Welch wrote on the back of his letter of October 14, 1887, the following statement, namely:

"November 12, 1887, Wellston, Ohio.

"First National Bank, Wellston, Ohio—Dear Sir:  You are hereby authorized to deliver to the Consolidated Wellston Coal & Iron Company, of Wellston, Ohio, the deed and assignments within mentioned as soon as the draft for $30,000 this day given me by you on New York City has been paid, as I have agreed with the consent of the within-named H. Wells to accept the said $30,-000 cash, and the obligation of said company to convey to me 50 lots in Wellston in full payment of the consideration price of said 465, and said judgments.     Very truly,     J. M. Welch."

Welch knew that his land was to be paid for out of the proceeds of the sale of the mortgage bonds (stipulation, p. 7, par. 20), and that Hinckley, the purchaser of the bonds, had deposited with the First National Bank of Wellston sufficient moneys to pay for the land purchased by the company (including Welch's lands), deeds for which had been deposited with the bank, to be delivered when the purchase price should be paid.  Nevertheless, on that day (November 12, 1887) he entered into an agreement with Wells to reduce the price of his land to $40,000 and accept in payment thereof $30,000 in cash and 50 lots in Wellston, and consented to the payment of the balance of the original purchase price to Wells out of the moneys so deposited.  In carrying out this agreement $30,000 in cash was paid to Welch by the bank, and the company delivered to him its obligation to convey to him the 50 lots, and in addition thereto Wells transferred to him his (Wells') right and title to 25 other lots in Wellston, and assigned to him stock of the company of the face value of $2,500, and the balance of the original price, namely, $11,216, was paid to Wells out of the moneys so deposited.  The spirit of speculation was then rife, and, inspired by the optimism of Wells, he may have considered the lots and stock of greater value than $10,000, or he may have been influenced by the fear that Wells would refuse to take the land at the price asked.  Wells was surprised when informed that the property had cost Welch $11,216, and refused to pay more than $30,000 in cash.  He insisted that he "could not go on with the deal unless the money part was reduced to $30,000."  The weight of the evidence shows that Welch, when he delivered the deed to the company, did not expect to get more than $30,000 in money for his land, and that he relied on the obligation of the company to convey to him the 50 lots "in full payment of the consideration price."  He did not look to the land to secure the performance of the contract to convey the lots, nor will he be permitted to do so now, in view of the fact that he delivered the deed under circumstances which justified the mortgagee in believing that the purchase price of the land had been paid in full.  Under the circumstances presented he is estopped from setting up the lien, and, more than that, the mortgagee has the superior equity and a legal lien, which attached at the same instant when it is claimed a vendor's lien attached, namely, when the deed was delivered.  Fiske v. Potter, 2 Abb. Dec. (N. Y.) 144, 145.

Third.  Is the decree of the state court establishing a vendor's lien in favor of Lasley binding upon the complainant and the bondholders represented by it?

The complainant was made a party defendant in the suit in which the decree was entered, but denies that it was duly or legally served with process, or that it in any way submitted itself to the jurisdiction of the court, and insists that the question of jurisdiction may be submitted to, and should be determined by, this court.  It is admitted that no summons for the complainant "was issued in said cause, and that there was no other affidavit for service by publication, or other service by publication, or other proof of publication, than those of which said copies are hereto attached."  (See stipulation, p. 6, par. 15.)  The question for determination is whether the affidavit for service by publication was in substantial compliance with the provisions of

section 5046 of the Revised Statutes of Ohio of 1908, which provides as follows: "Before service of publication can be made, an affidavit must be filed that service of summons cannot be made within this state upon the defendant to be served by publication, and that the case is one of those mentioned in the preceding section; and when such affidavit is filed, the parties may proceed to make service by publication." The affidavit reads as follows:

"State of Ohio, Jackson County—ss.:

"Hiram G. Lasley, being first duly sworn says that service of summons cannot be made in this state upon defendant Francis E. Hinckley and the Farmers' Loan & Trust Company; that said Hinckley resides in Chicago, Ill., and said Farmers' Loan & Trust Company is a corporation organized under the laws of New York; and that this action or case is one of those mentioned in section 5048 of the Revised Statutes of this state.                   Hiram G. Lasley.

"Sworn to and subscribed before me this October 21, 1889.
                                              "T. J. Williams, Clerk,
                                                "E. P. Williams, Deputy."

The affidavit shows that service of a summons could not have been made in this state on both Francis E. Hinckley and the Farmers' Loan & Trust Company, but does not show that service could not have been made on the Farmers' Loan & Trust Company alone. The context shows that the company is a corporation organized under the laws of New York; but for aught that appears it may have been doing business in this state, and may have had an office and a managing agent here upon whom service could have been made. There is no context, showing that "and" was used by a mistake, which would justify the court in correcting the mistake by substituting for it the word "or." The attempted service, therefore, based upon this affidavit, is insufficient, and did not bring the Farmers' Loan & Trust Company before the court.

But it is urged that the court is one of general jurisdiction, and it must be presumed as a matter of law that it had jurisdiction to render the decree which Lasley seeks to enforce against the claim of the complainant. In Galpin v. Page, 18 Wall. 366, 21 L. Ed. 959, it is said by Mr. Justice Field that "the presumptions, which the law implies in support of the judgments of superior courts of general jurisdiction, only arise with respect to jurisdictional facts concerning which the record is silent." The record here is not silent. It shows that service by publication was not made in compliance with the laws of Ohio. Service by publication is authorized by special statutes in derogation of the common law, and there must be a strict and literal compliance therewith. In Morse v. Presby, 25 N. H. 302, the Supreme Court of New Hampshire says: "A court of general jurisdiction may have special and summary powers, wholly derived from statutes, not exercised according to the course of the common law, and which do not apply to it as a court of general jurisdiction. In such cases its decisions must be regarded and treated like those of courts of limited and special jurisdiction. The jurisdiction in such cases, both as to the subject-matter of the judgment and as to the person to be affected by it, must appear by the record; and everything will be presumed to be without the jurisdiction which does not distinctly appear to be within it."

Here the record shows that the state court did not acquire jurisdiction of the person of the complainant herein, and the decree, therefore, would be open to collateral attack; but in fact the defendant Lasley is setting up his decree and seeking to enforce it as a lien upon the lands in question superior to the mortgage of the complainant. It is said in Williamson v. Berry, 8 How. 495, 12 L. Ed. 1170, that "it is an equally well settled rule of jurisprudence that the jurisdiction of any court exercising authority over a subject may be inquired into in every other court, when the proceedings in the former are relied upon, and are brought before the latter, by a party claiming benefit of such proceedings." It does not appear that Lasley had any interest in the land which would entitle him to a vendor's lien. On cross-examination he testified as follows: "Q. Can you state what was the character of the title which you claim in that property? A. No, sir; I do not know that I can. Q. You say you do not know what sort of a claim or title you did

have? A. No, sir; not at that time I do not know. As I understood it, we were working for a title, to see if we had any."

Lasley had a judgment against Wells for $9,000, and was prosecuting a suit to find out whether he had any title to the land in question. Wells had judgments against Lasley for $6,740, and in order to get rid of the judgment for $9,000 and Lasley's suit for title to the land, which Wells was buying from Welch, he offered to cancel his judgments against Lasley and pay him $10,000, $8,000 in cash and $2,000 in lots, if Lasley would cancel his judgment, dismiss his suit, and give Wells a quitclaim deed to the lands in question. Lasley accepted this offer, executed the quitclaim deed, canceled the judgments, and dismissed his suit; and Wells on his part canceled his judgments, paid Lasley $8,000, and had the company agree to convey to him 10 lots at $200 a lot. The transaction was between Wells and Lasley, not between the company and Lasley. Wells did not agree, either on his own behalf or on behalf of the company, to pay $10,000 for the land. In the compromise and settlement between them Lasley's interest in the land cut little figure, and no definite part of the $10,000 was set apart for the payment thereof. The purchase money for the land was blended in the settlement and compromise with other items, and Lasley thereby waived his right to assert a vendor's lien for any part of the $10,000 as the purchase price of the land. 2 Jones on Liens (2d Ed.) p. 14, § 1072.

There will be a decree in favor of the complainant.